CORNELL, Executor, &c., *v.* VANARTSDALEN.

Subsequent promise to pay for work already done with knowledge of the party is binding.

Where there is a written promise to pay for such work, &c., for which the party would not otherwise be liable, and that refers to a particular kind of work, there can be no recovery for any other.

A promise by landlord to pay tenant for repairs, does not include improvements to the soil, or other matters which were only good husbandry. Nor does *it include new* erections of any kind, but simply a restoration of old or dilapidated buildings, &c.

A. the father-in-law of his tenant B., agreed to allow him for repairs he had made on the farm of A., provided he should turn him off. A. devised the farm to the children of B., who, continuing in possession, cannot maintain an action on the agreement.

Such an agreement is to be construed to mean that A. would not in his life-time eject his tenant without compensation. Per Rogers, J.

Tenant making new repairs and erections on the farm with the encouragement of the landlord, under a promise to give the farm to the tenant and his wife, (the daughter of the landlord,) may recover the value of such repairs and erections, if the landlord devise the farm to another.

Legatee and annuitant of a solvent estate having received her legacy, and released and assigned the annuity, is a competent witness for the executor.

The court cannot undertake to judge whether the release and assignment was colourable by one not party to the record. Per Rogers J.

The competency of a widow as a witness in a suit between her deceased husband's estate, and a stranger, depends on the rule of confidential communications. She is competent to testify to facts which were not confided to her by her husband, or learned in consequence of her domestic relations.

In error from the Common Pleas of Bucks county.

*Dec.* 31. Assumpsit against the executor of Adrian Cornell, who was the father-in-law of plaintiff. The plaintiff declared for goods sold, money laid out and expended, for work and labour done, and for goods sold on a *quantum meruit*, and also " for that the defendant's testator in consideration that the plaintiff had made sundry repairs, and performed divers work and labour in and upon a certain farm or plantation in the county aforesaid, upon which the said plaintiff then resided, and which belonged to the said Adrian. He, the said Adrian, promised and agreed that he would allow the said plaintiff a reasonable compensation for the repairs he had made upon the said farm, provided the said Adrian should turn him, the said plain-

tiff, off the said farm—and the said plaintiff avers that he had, at the time aforesaid, made sundry valuable repairs upon the farm aforesaid, amounting to $2500—and the said plaintiff avers that the said Adrian did afterwards turn him off the said farm. By means of which promise, &c."

The defendant pleaded non-assumpsit, and the statute of limitations.

The plaintiff gave evidence of repairs to buildings on the farm of Adrian Cornell, before and after the 31st March, 1838, which were paid for by plaintiff. Also of ditches dug and fences erected by him. He also proved the erection of corn-cribs, and hog-pens, &c., and of a thrashing machine driven by horse power, and a house to cover it, before the date above mentioned, and that Cornell was present whilst part of the work was going on, and made no objections; also the erection of a mill for turning broom handles, driven by water-power on the premises, which was finished in 1838 or 1839. He then proved the following instrument:

" I agree to allow George Vanartsdalen a reasonable compensation for the repairs he has made on the farm on which he lives, provided that I should turn him off.

" March 31st, 1838.                    Adrian Cornell "

The defendant objecting, (third bill,) 1. Because the condition was not shown to have been broken. 2. Because made after the repairs were made.

The plaintiff then called Joseph Haddonfield, who testified as follows: I heard Adrian Cornell say he would allow plaintiff for the improvements which had been made,—if plaintiff would build up a dry wall on cow-yard, the place should be his and his wife's some day. Plaintiff wanted to set off the improvements against the rent. Cornell said it was immaterial then, the place would be his and his wife's some day. There was then a kind of settlement between the parties. There was also something said about ditching—at another time the same thing occurred. He said this at different times. The first time in 1833—the second in 1837. They also spoke of the mill and pump floor. I then lived with plaintiff on the place. The parties were between the house and barn when the first conversation took place. The last was about ditching, pump floor and mill. At the last conversation I was present, about five yards off. The mill was finished in 1838 or 1839. Cornell did not tell the plaintiff not to build the mill. No one else present. The conversations were during the progress of the work.

The plaintiff, then, under exception (fourth) gave evidence of the

2 H 2

improvements in the soil of the farm by liming, and otherwise. The witness stated the land was improved $10 per acre, and that the mill put up was an advantage to the amount of its probable cost, which exceeded $500.

He then proved that in 1840, Cornell was heard to say he was much pleased with plaintiff's farming the property, and that the horse power was a useful building.

He also gave in evidence a lease by Cornell to plaintiff, dated 1833, for one year at $260 per annum, and proved payment of rent to 1839, inclusive. The plaintiff continued in possession at the time of the trial below. He then gave in evidence the will of Adrian Cornell dated in 1833, and proved in 1841. By this, after making sundry devises to his sons, he gave the farm on which plaintiff resides, to the children of Jane, (the wife of plaintiff,) subject to a charge of $2000 at five per cent. interest from the time of his decease, and subject to the maintenance of their mother during her life. He directed his executors to have the care and letting of the farm, and to see that sound timber was not cut: the expenses of repairs were to be paid out of the rent. If Jane remained on the farm, she was to pay a moderate rent, but if she became infirm, then the executors were to deduct out of the rent such a sum as she stood in need of. The rent was to be applied to the payment of the interest on the charge. If she died without issue, the farm was to be sold, and the proceeds paid to testator's other children. The residue of his estate was given to his sons, one of whom he appointed executor. Plaintiff was not mentioned in the will. Jane, plaintiff's wife, died three years before the trial.

The defendant called Rachel Cornell, the widow of testator, and showed that her legacy was paid, leaving an unpaid annuity under the will of $300. The rejection of the witness constitutes the fifth bill of exceptions. Having shown a release and assignment of all her interest under the will, he again offered her to prove, 1. That every year during A. Cornell's life, when plaintiff was to pay rent, all previous matters were settled. 2. That Cornell told plaintiff not to make these improvements. 3. That in January, before Cornell's death, plaintiff claimed a balance of $72, which it was agreed should be paid out of the rent. The witness was rejected as incompetent, (sixth exception.) The seventh bill was to the rejection of the same witness as incompetent to prove enmity existing on the part of plaintiff's witness to testator and his family.

The court (KRAUSE, P. J.) instructed the jury that repairs, in the agreement signed by Cornell, did not include new buildings, but a

restoration of that decayed, or a bettering of that in part destroyed, and under the circumstances it applied as well to the soil as to fences and buildings. That plaintiff was turned off, if by the will the land was given to another. On the question whether there was a consideration, the court said the plaintiff was bound to make all ordinary repairs not of a permanent kind at his own cost; but if Cornell encouraged him to make others, and expect compensation, and plaintiff did make them, there was a consideration to support the promise. Referring to Haddonfield's testimony, the court said if that promise was made on a compromise of plaintiff's claim on Cornell, there was a sufficient consideration. That the written promise included repairs to its date; as to the subsequent repairs and erections, if the jury found that Cornell, under a promise to give the farm to plaintiff and his wife, encouraged him to erect new buildings and make other repairs, the plaintiff was entitled to recover their cost. That the statute excluded all claims for repairs and new buildings, made more than six years before the bringing of this suit, for which there was not a subsequent promise by Cornell.

In answer to two points not included in the general charge, he said: A subsequent promise to pay for repairs which the tenant was bound to make was not obligatory. That a compensation by enjoyment of the premises was no bar, if there had been a promise to pay for improvements which the tenant had or should make.

The errors assigned were to the charge. 1. That improvements to the soil came within the terms of the agreement. 2. That by the will the defendant was turned off. 3. To the admission and rejection of evidence. 4. To the charge as to the obligation to pay for new erections under encouragement by testator. 5. And in the answers to eight of plaintiff's points. These were prayers for specific instructions, all of which were answered in the general charge.

*Fox*, for plaintiff in error.—The competency of Rachel Cornell depends on the subject-matter of her proposed testimony, as she had received her legacy and released all claim under her annuity, the estate being otherwise amply sufficient to cover that. There is no case excluding the widow in a suit between the personal representatives of her husband and a stranger, though I admit she is not competent if confidence is abused. Monroe *v.* Twisselton, 43 Geo. 3, in Norris' Peake, App. 29, is the leading case, and is cited by Phillips and Starkie. In Aveson *v.* Lord Kinnaird, 6 East, 192, the ground of her incompetency is stated to be, where there would be a violation

of confidence reposed in her by her husband.    In Beveridge *v.* Minter, 1 Carr. & Payne, 364, (11 E. C. L. R.,) the objection, that she is incompetent to do that, after dissolution of the marriage, which she cannot do while it exists, is overruled.` So in Coffin *v.* Jones, 13 Pick. 445, she is said to be competent to prove facts coming to her knowledge from other sources.    In Williams *v.* Baldwin, 7 Verm. 506, the exception is confined to communications from her husband, and she was allowed to prove his possession of a paper at a particular period.    In Wells *v.* Tucker, 3 Binn. 366, she was permitted to prove a *donatio causa mortis*.    So in Chambers *v.* Spencer, 5 Watts, 406, she is said to be competent when the husband is no longer civilly or criminally liable.    Stein *v.* Bowman, 13 Pet. 209, 23, was a case of confidence.    2 Kent. Com. 179, and 1 Greenl. Ev. § 337, 408, recognise the doctrine as here laid down, and it is founded on the broad principle, that the husband is to be protected; it is in his favour.    In Jackson *v.* Bard, 4 Johns. 230, 231, a widow was permitted to prove that a deed, executed during coverture, was ante-dated.    Certainly the forbidding of improvements and the acknowledgments of plaintiff were not matters received by her in confidence.

The evidence and charge as to improvements of the soil were clearly incorrect.    The agreement set up by plaintiff was written, and the construction was for the court.    Repairs of any damages was held, in McClenachan *v.* Curwen, 6 Binn. 515, not to include fences newly erected, but only those prostrated.    The meaning of the word could not be varied by evidence.    McDermot *v.* Insurance Company, 3 Serg. & Rawle, 607.    The court also referred to conversations anterior to this agreement, to charge us with the erection of new buildings, and to sustain subsequent acts.

There was no turning off in fact, nor can such a contract between a landlord and tenant be converted into an agreement to devise.

The mere assent or acquiescence in such improvements will not charge the party.    Long *v.* Fitzsimmons, 1 Watts & Serg. 532; 2 Kent, 468, 477.

*Chapman*, contrà.—The contract is to be construed according to the intent of the parties; the fact, that plaintiff expended his whole substance on the farm, shows his understanding that by the agreement he was at one time to own it.    Repairs is not a technical term, (1 T. R. 447,) it means restoration to a former state before deterioration.    The encouragement and satisfaction with the work done, in improvements of all kinds, were proved, and raise a moral obliga-

tion to pay, and this under the evidence was fairly left to the jury, and their verdict did not exceed the claim in the bill of particulars, which did not include new buildings.

The witness was interested, for her legacy could be levied on, and a creditor could compel her to refund. 1 Vern. 94, 2 Vern. 205, 1 Ch. Ca. 136.

The release and assignment to her son, the executor, was colourable, being made from necessity only. [Rogers, J.—Have the court ever decided such a release is colourable? is it not always left to the jury?] Clover v. Painter, 2 Barr, 47, was the case of the release of an equity by one not party on the record. She was interested in the very fund sought to be affected. [Rogers, J.—Does she participate in the residue? The sons are residuary legatees, and are of course excluded on that ground.] As to the objection as being widow, all the cases are cited on the other side.

*Reply.*—The charge authorized the jury to take into consideration the new erections.

*Jan.* 6. Rogers, J., (after stating the pleadings and the evidence excepted to.)—Under the same head and in the same connection I propose to consider the third and fourth bills of exception, and the first and second assignments of error.

There is no force whatever in the objection, that the promise contained in the written agreement was without consideration. For, if the plaintiff made repairs on the premises with the knowledge, assent, and encouragement of the landlord, it creates a moral obligation, which is a sufficient consideration for a promise. This the court properly left to the jury, and in this we do not perceive the semblance of error. But the construction of the paper, admitted in evidence, is a prominent part in the cause, and involves two considerations. First, what is meant by repairs; and next, what is the proper interpretation of the proviso.

Before proceeding to discuss the questions adverted to, I must premise that we view this as an agreement, not only as to the compensation, which was to be a reasonable one, but as a contract as to the nature and kind of expenditures, for which the allowance was to be made up to the time of its date, namely, the 31st March, 1838. Both parties are concluded up to that time, and must stand or fall by the construction of that agreement; for by virtue of it only can the plaintiff recover up that period. On the money counts only can he succeed by proof of a promise subsequent to the date of the written contract. No previous transactions can be regarded in estimat-

ing the compensation to which he may be entitled on the money counts. It is absolutely necessary, to the justice of this case, that these periods referred to should be kept separate and distinct.

What then was the intention of the parties in the use of the word repairs. It is not a technical expression, and must be taken as used in its ordinary sense, and in the common acceptation of the word it certainly does not extend to improvements of the soil. I cannot bring myself to believe that it ever entered into the mind of Cornell, that in signing the paper, he had bound himself, in a certain event, to make compensation to Vanarsdalen for the increased value of the property arising from an improved cultivation merely. That because, in the opinion of others, it had been, by means of liming and good husbandry, increased in value, including fences and general appearance, $10 per acre, he was bound to pay the difference. Liming and manuring a farm, which is neither more nor less than good husbandry, is improving not repairing; and this is a distinction well known and understood by every farmer in the country. It was not for nothing this word was used, but to guard against the very construction of the agreement which has been attached to it. If the parties intended to include improvements of every description, as the court seem to suppose, it is strange that a word of a much more restricted signification should have been selected. You speak of repairing a fence, or building, but it would be little less than non-sense to say that a farm was repaired, when you intended it had been increased in value by an improved cultivation of the soil. It is to such a case the word improve is properly applicable, and so the terms are always understood. Repairs do not include new buildings, but they are a restoration to a sound state, of what had gone into partial decay or dilapidation, or bettering of what had been destroyed in part. In this we agree with the court, but we differ from them when they say that repairs, under the circumstances, applies as well to the soil as to fences and buildings. That it refers to the latter we can well understand, but that it includes the former is not apparent to us, nor do we see any circumstances in evidence which can vary the result. The word repairs is plain, unambiguous, and must be considered as used in the sense in which it is ordinarily understood. To repair is to restore to a sound state, to mend, or refit. To be repaired is to be mended, refitted, or re-built. Neither of these definitions embrace an improvement of the soil by an improved cultivation, whether by lime or manure, or any other mode of culture.

But this ceases to be a question of much moment in the view we

take of the instruction of the court to the jury, that the plaintiff was turned off, (in the meaning of the proviso,) if Cornell, by the will in evidence, devised the farm from him, and gave it to another. The charge, of course, must be taken in reference to the will, for on that only must the plaintiff depend to support the allegation in the *narr.* on the special count. The plaintiff, who was the son-in-law of Cornell, held the land under a lease, dated the 23d December, 1833. Vanartsdalen alleged that while living on the property as tenant, he made certain repairs and improvements before and after the lease, for which, although he had no legal claim, being made without the assent or authority of the landlord, yet, under the circumstances, considering the beneficial nature thereof, he was entitled to compensation. This he repeatedly represented and pressed upon Cornell, and the latter thus urged was finally induced, in the year 1838, to give the memorandum in question; no doubt with the belief and confident expectation that it was full remuneration for all the expense to which Vanartsdalen had been put, by any repairs he made to the premises. So far as appears, the arrangement appears to have been perfectly satisfactory to both parties, until after the death of Cornell, and the subsequent disposition of his property by will. In the written memorandum, Cornell in effect says, that although he does not consider himself bound to pay the amount of the expenditures claimed, of whatever kind or nature they may be, yet to quiet apprehension, and free himself from importunities, he is willing to agree, that if he should at any time find it necessary or convenient to resume the possession, he will pay a moderate compensation for any repairs in the strict and ordinary meaning of the term, which may have been made to the property. The agreement will not, in our apprehension, bear any other interpretation, unless the terms used are twisted and tortured into a signification; for which we see no warrant, either in the contract itself, or the attending circumstances. It strikes me most forcibly, that the resumption of the possession alluded to must be in the lifetime of Cornell, and has no reference to a subsequent disposition by will. It obviously looks to an act done and consummated by Cornell himself, in which *he*, not his executors, agrees to allow reasonable compensation for repairs. We must recollect it was a benevolence, not a right; for which reason, I cannot bring myself to believe that the promisor had any intention to interfere with his unquestionable right to give his property, without restriction, to any person he pleased, much less to his daughter and grand-children. We cannot restrict the *jus disponendi* by will, unless the intention be plain and manifest.

But be this as it may, was the court right in instructing the jury that by the will, the penalty in the contract was incurred? In other words, was the plaintiff, in the language of the agreement, turned off the farm on which he lived? This is a proposition, we think, difficult to maintain. In point of fact, he was not turned off. The evidence is uncontradicted, that he always did, and still continues to reside on the farm. He was on the premises at the death of the testator, continued to reside on it in right of his wife, after his death, and now resides on it, but under what conditions he holds it we are not informed. Giving the will its utmost force and latitude, it is but an unsuccessful and abortive attempt to dispossess him. He is, so far as appears, in the full enjoyment of all the rights to which he was, in any way, entitled during the life of the testator. In what then is he injured? If he wishes to avail himself of the contract, he must give up the possession. He cannot have both. Cornell agrees to allow him a reasonable compensation, provided he turns him off. Suppose Cornell had ordered him to leave the property—had even taken legal but ineffectual means to enforce it—could Vanartsdalen maintain a suit on the promise, and hold the possession also? This will not be pretended, and yet it is difficult to understand, in what respect the cases differ. Further, suppose he had sold the property to another, and Vanartsdalen had refused to deliver up the possession, can it be, that while in possession he could support a suit on the agreement? It is not alleged that he was molested or disturbed by Cornell or his executors, or if by the latter it, has been successfully resisted, except we adopt the construction that the will gives effect to the proviso. But has the will the operation attributed to it? That Cornell had no idea that he was violating any promise or engagement with Vanartsdalen, is most probable. He may have supposed, and in that correctly, that he had substantially complied with his promise by devising a life-interest to the wife, which would, of course, enure to the benefit of the husband, with a remainder in fee to their children. By the will, the wife acquires an interest, during life, under which the husband had a right, and did occupy the premises. That it was incumbered, will make no difference, nor can it alter the case, that the devise was to her, and not to her husband for admitting he may have said, in a casual conversation, as is proved by one of the witnesses, that it was to be his and his wife's, can it be fairly concluded that he intended to convey the impression that it was to be in the form of a direct devise to her? These words are satisfied by a devise to the wife, in right of whom he can occupy and enjoy the premises.

Thus suppose he had devised an estate in fee-simple to the wife, would any person contend that under any proof in this cause, the plaintiff could continue to hold and occupy the estate, and have a right of action on the promise also? So far as appears from any proof in the cause, Vanartsdalen is in as good, and but for the unfortunate death, in a better position than he was during the lifetime of Cornell.

But the plaintiff claims not only for repairs before the 31st of March, 1838, which depend on the effect of the agreement of that date, but for erections and improvements made after that time. And this will depend on the testimony after that period. If Cornell, under a promise to give the farm to plaintiff and his wife, encouraged him to erect new buildings, or make other repairs, and the plaintiff having done so, Cornell devised the farm from him to another, the law implies an obligation to pay for them. The landlord, it is true, is not bound to allow the tenant for repairs on any improvements whatever, made without authority. If the tenant repairs, he does it at his own expense, and if he chooses to put permanent repairs on leased property, he cannot charge it in account with the landlord. Long *v.* Fitzimmons, 1 Watts & Serg. 532; 3 Kent's Com. 468, and 4 Kent's Com. 110. But where the repairs are made with the assent and by the authority of the landlord, the law is otherwise, for in that case the expense may be thrown upon the landlord, and that without any express promise to pay. If it was with his assent, and for his benefit, the law will imply an obligation to pay for them. It would be a fraud upon the tenant of land to pay the expense out of his own pocket. What amounts to an assent or authority from the landlord, will depend on the circumstances, of which the jury will judge. Merely standing by without objecting will not suffice; there must be some act and encouragement from the landlord, to entitle the tenant to charge the landlord.

It remains only to consider the rejection of Rachel Cornell, the widow of Adrian Cornell, as a witness. That she cannot be excluded on the ground of interest, is too plain to admit of argument. If she has any interest, it is in the question which never renders a witness incompetent. Under the will she is but a legatee, and can have no interest excepting the estate be insolvent, which is not pretended here. That a legatee may be admitted in a suit for or against the estate will not admit of doubt, for if the estate is solvent, which is always presumed, his interest cannot be affected. It is a contingent interest which has never been held a disqualification. Besides, the witness executed an assignment, and although it may

2 I

have been colourable, and probably was, yet that is a matter of which the court, except in the case of a party to the record, do not undertake to judge. The evidence, under proper directions, is always referred to the decision of the jury. But it is said to be against the policy of the law, to permit a wife to testify for or against the estate of her deceased husband; that parties are excluded from being witnesses for themselves, and that the same rule applies to husband and wife, neither of them being admissible as a witness in a cause, civil or criminal, in which the other is a party. The exclusion is founded partly upon the identity of their legal rights and interests, and partly on the principles of public policy. And, neither is it material, in some cases, that this relation no longer exists. The great object of these rules being to secure domestic happiness by prohibiting *confidential communications* from being divulged, the rule is the same to that extent, even though the other party is no longer in being, or has even been divorced and married to another person. The rule is the same in its spirit and extent, as that which excludes confidential communications made by a client to an attorney. And in analogy to this rule, it is held, that the wife, after the death of the husband, is competent to prove facts, coming to her knowledge from other sources not by means of her situation as wife, notwithstanding they relate to the transactions of her husband. The prohibition, where she is a competent witness, being divested of all interest, extends to confidential communications alone, or such as come to her knowledge from her domestic relation. Coffin *v.* Jones, 13 Pick. 445; Williams *v.* Baldwin, 7 Vermont, 506, and Wells *v.* Tucker, 3 Binn. 366. In the case in hand, it is difficult to imagine in what respect any confidential communication is divulged, or any domestic confidence abused. She is brought forward to testify *for* the estate, so that a confidential communication, merely, would not be evidence on other grounds, although it might be evidence if permitted against the estate. In every case where the question has arisen, the wife has been offered to charge her former husband or his estate. Indeed, it is somewhat difficult to understand how the point can arise, when her testimony is offered in favour either of the former husband or of his estate after his death. She may have a strong bias it is true, but that goes to her credit and not to her competency; but in what respect public policy arising from the domestic relation forbids her to testify, is not apparent to my mind. In the evidence offered, there is nothing either confidential or improper to be disclosed. It is testimony to facts which must have necessarily come to her knowledge from other sources than confidential communications from her

deceased husband. The defendants offer to prove, that every year during the lifetime of her husband, when plaintiff was to pay rent, all previous matters were settled; that Cornell told him not to make those improvements, and that in January before Cornell's death, plaintiff claimed a balance of $72, which it was agreed should be paid out of the rent; and also to prove as rebutting testimony to the evidence of plaintiff's witness, that he, the witness, had enmity to her husband and all her family. Although it does not distinctly appear in what way she came to the knowledge of these facts, which are certainly material to the issue, yet there is no reason to believe, but directly the contrary, that it proceeded from confidential communications, or was the necessary result of the domestic relations. As then the reception of the evidence would contravene no principle of domestic or public policy, we are of opinion the testimony was improperly rejected.

Judgment reversed, and a *venire de novo* awarded.