Catharine Dumbach *v.* Annie Bishop, William Bishop, Matilda Enslen, Sadie Lauffer and Louisa Dumbach, Appellants.

[Marked to be reported.]

*Trusts and trustees—Resulting trust—Husband and wife—Ejectment.*

In an action of ejectment to establish a resulting trust in favor of a wife as to real estate standing in the name of her husband, the testimony to establish the trust must in its entirety be sufficient to satisfy not only the jury, but also the court sitting as a chancellor reviewing the testimony; and if it is deficient as to the latter, it must be withdrawn from the jury.

In an action by a wife to establish in her a resulting trust of property standing in the name of the husband, the evidence is sufficient to sustain the trust if it shows that the wife had received from other sources than her husband much more than enough of money to pay for the land, and that she actually paid for the land with this money.

*Evidence—Competency of witness—Party dead.*

In an action of ejectment by a wife to recover land standing in the name of her deceased husband, but which she claimed had been paid for with her money, the plaintiff is a competent witness to testify to a transaction which a witness for the defendant had described as occurring in the presence of witness, plaintiff and her husband.

Argued Oct. 19, 1897. Appeal, No. 78, Oct. T., 1897, by defendants, from judgment of C. P. Butler Co., Sept. T., 1896,

No. 73, on verdict for plaintiff. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Ejectment for two lots in Evans City. Before GREER, P. J. The facts appear by the opinion of the Supreme court.

At the trial the court admitted under objection and exception the testimony of the plaintiff as to a transaction which William Bishop, a witness for defendants, described as occurring when the witness, the plaintiff and her husband were present. [2]

Defendants' point and the answer thereto among others were as follows:

3. The evidence in this case is not sufficiently clear, explicit and satisfactory to justify a submission to the jury of the question of a resulting trust in favor of the plaintiff, and the verdict must, therefore, be for the defendants. *Answer:* Refused; we leave that question to the jury. [1]

Verdict and judgment for plaintiff. Defendant appealed.

*Errors assigned* were (1) above instructions, quoting them; (2) ruling on evidence, quoting the bill of exceptions.

*Lev. McQuistion* and *W. H. Lusk*, with them *A. T. Black*, for appellants.—A recovery by means of the verdict of the jury will not be permitted upon a title that is void in law, unless equity and good conscience entitle such party to the intervention of a chancellor: Wylie v. Mansley, 132 Pa. 65; Logan v. Eva, 144 Pa. 312; Hess v. Calender, 120 Pa. 138; Reno v. Moss, 120 Pa. 49; Hoover v. Hoover, 129 Pa. 201; Gilchrist v. Brown, 165 Pa. 275.

Plaintiff was not a competent witness: Johnson v. Watson, 157 Pa. 454.

*J. D. Marshall*, for appellee, cited as to the competency of the plaintiff as a witness: Cornell v. Vanartsdalen, 4 Pa. 364; Homan v. Homan, 12 W. N. C. 86; Robb's App., 98 Pa. 501; Stephens v. Cotterell, 99 Pa. 188; Adams v. Bleakley, 117 Pa. 283; Johnson v. Watson, 157 Pa. 454.

Cited as to the sufficiency of the evidence to establish a resulting trust: McLaughlin v. Fulton, 104 Pa. 161; Light v. Zeller, 144 Pa. 570; Logan v. Eva, 144 Pa. 312.

OPINION BY MR. JUSTICE GREEN, January 3, 1898 :

. Two questions only are raised on this record, one that the evidence is not sufficient in character or quality to create a resulting trust, and the other, the competency of the plaintiff as a witness. In regard to the first, the well established rule of long prevalence is, that the testimony in its entirety must be sufficient to satisfy, not only the jury, but the court also, sitting as a chancellor, and if it is deficient as to the latter it must be withdrawn from the jury. This being the undoubted rule in this class of cases, it is only necessary to investigate the testimony to learn whether it conforms to the standard. It must be observed that there is no question of purchasers or of creditors involved in the issue. The plaintiff is the widow of John Dumbach in whose name the legal title to the land in dispute was held, and the defendants are her own children. The latter claim title by descent from their father, and their mother claims that the land was bought for her, at her own instance, and was paid for by her, and with her own money, and that she therefore has a valid equitable title to the land by way of a resulting trust. There is of course no question as to the sufficiency of her title if the facts in evidence are such as to establish it, tested by the rule heretofore stated. The land in dispute consists of two lots, Nos. 17 and 19, in Stewart's plan of lots in the borough of Evans city, 45 feet by 140 feet each. The deed for these and two other lots, Nos. 13 and 15, was made on June 10, 1890, by Martin Wahl to John Dumbach. The plaintiff claims that the consideration for the two lots 17 and 19 was $600, the whole of which was furnished and paid by her. The witnesses in support of the claim are Louisa Dumbach, one of the defendants, and a daughter of the plaintiff, and the plaintiff herself. There were some preliminary negotiations for the purchase of the lots, conducted by William Bishop, one of the defendants, the husband of a daughter of the plaintiff. On this subject Louisa Dumbach testified as follows, in reply to a question asking her to state the conversation between her father, her mother and Bishop : " The first was that Bishop wanted father to buy a lot and build a house, and father told him to go and see if he could get the lots from Mr. Stewart ; so father told him to go and buy two, and then mother came in and said to go and buy two for her ; mother said she would pay for two and father said he

would pay for two and the deed was to be made in mother's name for all." Afterwards the witness said that Bishop brought a deed, and being asked, "When were the lots paid for?" she answered, "When he brought the deed. Q. Who paid Bishop the money? A. Mother. Q. Who paid for the two $300 lots? A. Mother. Q. What was to be the price of the first two lots, the one the house is on and the one next to it? A. I don't remember. Q. Was there any price mentioned in your presence for any of the lots? A. Yes, sir. Q. What was the first to cost? A. $400. Q. And the next? A. $300. Q. Which two lots was it arranged your father was to pay for? A. The $400 one and the one next to it. Q. Which was your mother to pay for? A. The next two. Q. Which lots, if any, did your mother pay for? A. For the two next the school house. The Court: The two farthest away from the $400 lot? A. Yes, sir. Q. Did you see the money paid? A. Yes, sir. Q. Who paid the money? A. Mother. Q. Did you know of your mother having money of her own? A. Yes, sir. Q. Where did she get the money she paid for these lots with? A. From her sister's estate. Q. Who had that money or part of it borrowed from your mother? A. Father. Q. And had he paid it back? A. Yes, sir. Q. What money did he pay it out of. A. Bonus money. Q. Do you know of your father paying that money back? A. Yes, sir. Q. Was it before the lots were purchased? A. Yes, sir. Q. Was it a long time or a short time before? A. Not very long before. Q. Do you know whether it was out of that money that your mother paid for these two lots? A. Yes, sir. Q. Do you know whether your mother kept your father's money, also? Yes, sir. Q. Do you know whether she kept it separate from her own? A. Yes, sir. Q. Did she pay all the money? A. Yes, sir. Q. Did she pay for the first two lots out of her own or your father's? A. Out of father's. Q. Did your mother know anything about the deed being in your father's name? A. Yes, sir. Q. Did your mother make any objections to it? A. Yes, sir. Q. What did your father say in reply. A. He said he would make a different deed; and he didn't get it done. The Court: Did he say to whom he would make the other deed? A. To mother."

On cross-examination she was asked, "Q. You say your mother paid all of the money? A. Yes, sir. Q. There was

part of the money out of your father's money and part out of your mother's? A. Yes, sir. Q. Where did your mother keep that money? A. In the pocket books. Q. Keep it in separate books? A. Yes, sir. Q. Do you know which one was his? A. Yes, sir. Q. How much was taken out of his? A. Seven hundred dollars. Q. And how much out of her own? A. Six hundred dollars."

It had been previously proved that on the settlement of her guardian's account she was entitled to receive $783.24, and her guardian, Henry Knouf, testified to the payment by him to her of several sums of money, one of which was $288, besides what he paid her as guardian. This $288 was her share of the dower money which was payable at the death of her grandfather's widow. It was paid to the plaintiff by Henry Knouf who had accepted the land of his father upon proceedings in the orphans' court in partition. He testified also that she was entitled to receive another sum of $130 out of his brother's estate at the death of his second wife. While he did not see that money paid to her he testified positively that she did get it. He testified to another sum of $200 which was loaned to her husband, but which he says was passed to her. He did not know how much she received from her sister's estate, but Louisa Dumbach testified that the $600 which was paid for the two lots in dispute, came from the estate of her sister.

There was therefore an abundance of testimony, and uncontradicted, to show that the plaintiff had received from other sources than her husband, much more than enough money to pay for the two lots in dispute. The testimony of Louise Dumbach, if believed by the jury, was entirely sufficient to make out all the requirements necessary to establish a resulting trust. It was direct, positive, certain, unambiguous, clear and satisfactory on the important questions as to the possession of the money and also as to its payment. As to the amount of money and the sources from which it was derived there was no contradiction. As to the payment of the money, Louise Dumbach said it was paid by her mother, and the only witness in contradiction, William Bishop, said it was paid by Mr. and Mrs. Dumbach, without individuating the particular person who handed over the money. This is not a contradiction of Louise Dumbach's testimony, but rather a corroboration of it, inasmuch

as she specifically names the one person who actually paid it over, and he does not contradict that statement. It is true he testifies that the money was paid at his house in Evans City, while she says it was at her mother's house, but that is of minor importance since it only concerns the place of payment, and not the fact of payment, which is the really serious matter in controversy. Moreover two witnesses say there was another payment of $800 which took place at the house of Bishop at which the same persons were present, and the jury may well have reconciled the minor contradiction as to place by considering that the witness had confounded the two places as to this particular payment. But the testimony of Louise Dumbach was not the only testimony on the subject. The plaintiff was herself examined as to the conversation which Bishop testified was conducted when she was present with her husband. Being asked to give an account of that conversation she said, "He (Bishop) came there and wanted Mr. Dumbach to buy a lot, that was the first, and he said the Stewart lots was laid out and Mr. Wahl had them bought, and Mr. Dumbach says : 'you go and buy two,' and I told him to buy two for me ; Mr. Dumbach had said to 'make the deed in mother's name' and I says you can buy the other two and I will pay for my own, and the lots was all made in one deed to Mr. Dumbach. . . . And he went and bought the lots and brought the deed to our place and we read the deed, and I said, that is not made as it should have been, and Mr. Dumbach says, we will fix that; he told me just to go and pay the money and I paid him ; it was paid in our back room for the lots, for I wasn't away from home. Q. How is that; was it paid at two different times? A. No sir, it was all paid at once in our house. The Court: Mr. Bishop says when he went to buy the lots you gave him some to pay on them? A. There was no money paid the first time, when he bought the lots, he brought the deed before any money was paid ; the only money paid in his house was the $800 that he was to pay for the building. The Court: She may state who gave the money the first time. A. I handed it to him ; he got it all at once when he brought the deed. Q. Was there any of the purchase money paid, as testified to by Mr. Bishop, at his house in Evans City? A. No, sir. Q. What money was that? A. That was the time he was building, he paid $800; he was

living in the Ash house." Mrs. Bishop simply testifies that she was present when the deed was handed to her father and the purchase money paid, and that she does not recollect of any person being present but Mr. and Mrs. Dumbach and Mr. Bishop and herself. She does not say at what place this occurred. Mr. Kline testified that Mr. Dumbach told him at one time that he had paid to his wife some money which she got from her sister. In view of the condition of the testimony as to various matters it would not have been possible to withdraw the case from the jury. As the credibility of the witnesses was somewhat involved, though not upon the more important matters in controversy, it was the proper function of the jury to deal with that particular subject. But we are not able to say that we are dissatisfied with the verdict. The court below approved it and, we think, correctly. It is almost impossible to conceive that the story of the plaintiff and her daughter was a pure invention, and that the money which they testified was the money of the plaintiff, and was paid by her, was not her money, and was not paid by her. They are plain, simple minded people, to whom the fabrication of such a scheme of fraud and falsehood cannot possibly be imputed consistently with any testimony in the cause, and we could not feel the least justification in making any such implication. So far as we are concerned, sitting as chancellors reviewing the testimony, we feel obliged to say that we do not discredit or doubt the testimony of the plaintiff and her daughter, and with that conviction we could not sustain the first assignment of error.

The second assignment raises the question of the competency of the plaintiff as a witness to testify to the conversation which was given in evidence by Bishop for defendants as having taken place in the presence of the plaintiff and her husband, and with him, Bishop. The plaintiff was not called in chief, but after Bishop had testified to this particular conversation, and said that the plaintiff was present, she was called in rebuttal, and was admitted as a competent witness for that purpose by the court below, under the authority of the Act of 1891, P. L. 287. In this there was no error. The very purpose of the act was to enable persons situated precisely as this plaintiff was, to testify to matters which occurred in the presence of the dead party to a thing in action and any other person, where such other person

has already testified on the trial to the facts occurring in the presence of all. The act gives competency to a surviving party to a thing or contract in action to testify " to any relevant matter, although it may have occurred before the death of said party, or the adjudication of his lunacy, if, and only if, such relevant matter occurred between himself and another person who may be living at the time of the trial, and may be competent to testify, and who does so testify upon the trial, against such surviving or remaining party, or against the person whose interest may be thus adverse, or if such relevant matter occurred in the presence or hearing of such other living or competent person." It seems to us that these precise elements of competency are present in this case. The plaintiff is the surviving party to the thing or contract in action, her husband who held the adverse interest is dead. Bishop is the competent witness who testifies on the trial to a transaction which occurred when he, the plaintiff and her husband were together. Having so testified adversely to the plaintiff, the act declares that the surviving party may, in just that concurrence of circumstances, testify to the relevant matter in question. The act is, of course, general, and applies to all persons, without any mention of persons affected by the marital relation. It may be conceded that such persons might not be included within the capacitating provisions of the act if they were otherwise incapacitated by reason of the special relation. But on that subject the authorities are very clear that the death of one of the parties having dissolved the relation, only confidential communications passing between the parties while the relation continued, are excluded. The act of 1887 relates only to living husbands and wives, and makes no provision in the case of the death of either. The clauses *b* and *c* of the fifth section are the ones that apply to this relation. Clause *c* says nothing about it. Hence the general authorities applicable without any reference to the act of 1887 are the ones which control the present question. Thus in Cornell v. Vanartsdalen, 4 Pa. 364, we ruled that a widow of a decedent, against whose estate an action was brought by a tenant, who claimed to recover on the common counts and for repairs made to the leased premises, was competent to testify to what took place between her husband and the tenant at various settlements which had been made between them. We

held' that the competency of the widow depended on the rule of confidential communications. ROGERS, J., delivering the opinion, said, " The great object of these rules being to secure domestic happiness by prohibiting confidential communications from being divulged, the rule is the same to that extent, even though the other party is no longer in being, or has even been divorced and married to another person. The rule is the same in its spirit and extent as that which excludes confidential communications made by a client to an attorney. And in analogy to this rule, it is held that the wife, after the death of the husband, is competent to prove facts coming to her knowledge from other sources, not by means of her situation as wife, notwithstanding they relate to the transactions of her husband." The same ruling was made by this Court in Homan v. Homan, 12 W. N. C. 86. In Robb's Appeal, 98 Pa. 501, a servant preferred a claim before an auditor, in the distribution of a decedent's estate for services rendered to the decedent in his life time, and called the widow to testify in support of her claim. She was admitted as a witness, after objection to her competency, in the court below, and we sustained her competency. The present Chief Justice delivering the opinion said, " It is contended that on grounds of public policy the widow of the decedent was incompetent to testify to the contract on which appellee's claim for wages is based; that the disqualification incident to coverture continued after the death of her husband, and is not limited to what occurred in their confidential intercourse, but extends to all facts and transactions which came to her knowledge during their marital relations. While the principle thus broadly stated has sometimes been recognized, the better and more generally received opinion is that the disqualification is restricted to communications of a confidential nature, and does not embrace ordinary business transactions and conversations in which others have participated." After stating that the court below admitted the widow's testimony to conversations between her husband, herself and the appellee, which resulted in a contract of hiring, the opinion proceeds, " These conversations as shown by the testimony are not in any proper sense of the term confidential communications, and there was therefore no error in permitting the witness to testify." In Stephens v. Cotterel, 99 Pa. 188, we said, MERCUR, J., " The

mere fact that Mrs. Stephens was called to testify against the interest of the estate of her deceased husband did not make her incompetent. She is competent to testify to facts which came to her knowledge otherwise than through the confidential relations existing between her and her husband. Such were the facts here, and she was therefore competent."

In the present case there is no question that the matters testified to by the plaintiff were not confidential communications. They were not matters imparted to the plaintiff by her husband, but were acts and conversations between herself and her husband and a third person, Bishop. The case of Johnson v. Watson, 157 Pa. 454, has no relevancy whatever. That was an action of replevin in which the husband was plaintiff and the title of the wife to the goods was set up against him. We held that " As the issue stood upon the record when the jury was sworn, and on the trial, it was between plaintiff and his wife." This presented nothing but the plain case of a husband testifying against his wife, as to which the rule of the common law is not changed but confirmed by the act of 1887, sec. 5, clause c. In the present case it was not claimed that the wife was competent as a general witness, but only by way of rebuttal under the special circumstances provided for in the act of 1891, and in that case she was clearly competent. There was no such question in Johnson v. Watson.

Judgment affirmed.