782 A.2d 490

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Peter CHIAPPINI, Appellant.**

Supreme Court of Pennsylvania.

Argued Feb. 3, 1999.

Decided July 23, 2001.

508

John P. Moses, Wilkes Barre and Joseph M. Nocito, Kingston, for Peter Chiappini.

Michael J. Barrasse, Dist. Atty., Lisa A. Gillick and John J. Notarianni, Asst. Dist. Attys., for Com.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

### OPINION ANNOUNCING THE JUDGMENT OF THE COURT

ZAPPALA, Justice.

We granted allowance of appeal in this matter limited to two issues (1) whether the trial court erred in admitting the testimony of Denise Chiappini, who was the Appellant's wife at the time of the events to which she testified; and (2) whether the Appellant should have received credit towards his sentence for time served in a home confinement/electronic monitoring program. Regarding the first issue, we hold that the court did not err in allowing Denise Chiappini to testify about actions of the Appellant that she observed. As to the second issue, we hold that the Appellant is entitled to credit for 518 days spent in the home confinement/electronic monitoring program.

The Appellant was charged with arson, risking a catastrophe, and recklessly endangering another person in connection with a fire that occurred on the night of May 27, 1991, at a house in Scranton. The Appellant and his wife owned the house and had resided there from 1989 through the early part of spring of the same year. Expert testimony indicated that the fire had been burning for at least two hours before it was discovered at about 11:30 p.m., and that it was intentionally set and fueled by an accelerant. There was also evidence that the Appellant had sold some of the kitchen cabinets from the

house and had increased the insurance coverage on the house prior to the fire.

In addition, the Commonwealth's case included testimony by Denise Chiappini, who was divorced from the Appellant in 1992. The Appellant filed a motion in limine arguing that pursuant to 42 Pa.C.S. § 5914 she was not permitted to testify about what the Appellant had said or done that evening. The court ruled that she could not testify concerning statements made to her by the Appellant but that she could testify about his actions.

■ In summary, Denise Chiappini testified that on May 27, 1991, between 6:00 and 8:00 p.m., the Appellant and she went for a ride in their car, with her driving and the Appellant directing her, eventually reaching the vicinity of their previous residence. As they were travelling on a road behind the property, the Appellant got out of the car and ran into the woods in the direction of the house, disappearing from her view. While he was gone, she proceeded further down the road, turned the car around, and went back to the place where the Appellant had gotten out of the car. He reappeared from approximately the same place in the woods, got back in the car, and they returned home.

■ There are a number of difficulties involved in trying to delineate the parameters of the spousal confidential communications privilege to be applied in this case. At the outset, although 42 Pa.C.S. § 5914 was enacted in 1976 and made effective in June of 1978 as part of the Judicial Code, it is substantially a reenactment of legislation dating back to 1887, which itself had roots in the common law.[1] At the time this precept was first incorporated into the Commonwealth's statutory law, the rules of construction held that statutes in derogation of the common law were to be strictly construed. Although this rule of construction has not been generally ap-

---

1. Section 5914, entitled "Confidential communications between spouses," states, "Except as otherwise provided in this subchapter, in a criminal proceeding neither husband nor wife shall be competent or permitted to testify to confidential communications made by one to the other, unless this privilege is waived upon the trial."

plicable since 1937, see 1 Pa.C.S. § 1928(a), it continues to apply to "[p]rovisions enacted finally prior to September 1, 1937 which are in derogation of the common law." 1 Pa.C.S. § 1928(b)(8). Another rule of statutory construction, 1 Pa. C.S. § 1962, indicates that "[w]henever a statute is repealed and its provisions are at the same time reenacted in the same or substantially the same terms by the repealing statute, the earlier statute shall be construed as continuing in active operation." Thus the rule of strict construction continues to apply, despite the fact that Section 5914 was enacted in 1976.

■■■ Properly understood, this rule of strict construction presumes that common law rules, as developed and refined by the courts, are to continue as before, and are altered or abrogated by a statute only to the extent that the legislation specifically requires such a result. If a circumstance does not plainly fall within the language of such a statute, the courts do not attempt to "interpret" or "discern legislative intent" in order to apply the statute. Rather, the statute does not come into play at all and the courts are to apply the common law rule.

With respect to the rules regarding spousal testimony, not many years after the adoption of the Act of May 23, 1887, this Court observed that the Act "relates only to living husbands and wives, and makes no provision in the case of the death of either.... Hence the *general authorities applicable without any reference to the act of 1887* are the ones which control the present question." *Dumbach v. Bishop,* 183 Pa. 602, 608, 39 A. 38 (1898) (emphasis added). Likewise, as recently as 1977, in *Commonwealth v. Borris,* 247 Pa.Super. 260, 372 A.2d 451 (1977), the Superior Court recognized the distinction between applying the statutory rule and applying the common law rule in the case of marriages terminated by divorce. Speaking of the privilege governing "confidential communications made during a marriage, subsequently terminated by death or divorce," the court stated, "The Act of 1887 does not contemplate those situations. See 2 Henry, Pennsylvania Evidence § 699 (4th Ed.1953). Our courts have followed the common law rule in those cases." 372 A.2d at 454.

■ In this case, therefore, where Peter and Denise Chiappini were no longer husband and wife at the time of trial, the question is not whether her testimony should have been excluded "pursuant to 42 Pa.C.S. § 5914." The statute does not apply. Rather, the question is whether her testimony should have been excluded pursuant to the common law rule.

At this point we encounter another difficulty, namely presenting an accurate statement of the common law rule. The earliest of the cases quoted in *Dumbach v. Bishop* was *Cornell v. Vanartsdalen*, 4 Pa. 364 (1847), which stated:

> The great object of these rules being to secure domestic happiness by prohibiting *confidential communications* from being divulged, the rule is the same to that extent, even though the other party is no longer in being, or has even been divorced and married to another person. The rule is the same in its spirit and extent, as that which excludes confidential communications made by a client to an attorney. And in analogy to this rule, it is held, that the wife, after the death of the husband, is competent to prove facts, coming to her knowledge from other sources not by means of her situation as wife, notwithstanding they relate to the transactions of her husband. The prohibition, where she is a competent witness, being divested of all interest, extends to confidential communications alone, *or such as come to her knowledge from her domestic relation.*

4 Pa. at 374 (first emphasis in original, second emphasis added). The latter emphasized phrase, being stated separately and in the disjunctive, might be taken to mean that matters coming to one's knowledge from the domestic relation constitute something different from "confidential communications," yet similarly protected from disclosure.

A similar inference might be drawn from another case quoted in *Dumbach*, i.e., *Stephens v. Cotterell*, 99 Pa. 188 (1882), which stated, "She is competent to testify to facts which came to her knowledge otherwise than through the confidential relations existing between her and her husband." The corollary to this statement would be that she was incompetent to testify to facts which came to her knowledge through

the confidential relations existing between her and her husband.[2]

The third case quoted in *Dumbach v. Bishop,* however, *Robb's Appeal,* 98 Pa. 501 (1881), rejected the argument "that the disqualification incident to coverture continued after the death of [the witness's] husband, and is not limited to what occurred in their confidential intercourse, but extends to all facts and transactions which came to her knowledge during their marital relations." The Court observed, "While the principle thus broadly stated has sometimes been recognized, the better and more generally received opinion is that the disqualification is restricted to communications of a confidential nature, and does not embrace ordinary business transac-

---

**2.** Without direct citation, this Court made a similarly broad statement in *Commonwealth v. Wilkes,* 414 Pa. 246, 199 A.2d 411 (1964), which is quoted by the Appellant: "Confidential communications between them and facts which have come to their knowledge through the marital relationship cannot be divulged by either without the consent of the other." *Id.* at 413. *Wilkes* involved a man on trial for killing his son. Both men were engaged in illicit relationships with the same woman. The shooting occurred when the son, looking for the woman, broke down the door of his father's house and attempted to enter. The evidence in question consisted of five "lurid and vulgar love letters" written by Wilkes to the woman and answered by her on the back, which, by showing the relationship between the defendant, his son, and the woman, were relevant to demonstrating a possible motive for the killing. The letters had been found by the defendant's estranged wife when she went to her husband's house to retrieve clothes for her daughter shortly after the shooting. The wife turned the letters over to the mortician, who then gave them to the police.

Wilkes argued that admission of the letters "in effect permitted the wife to testify or give evidence against her husband, contrary to the provisions of the Act of May 23, 1887." 199 A.2d at 413. The Act was clearly applicable because Wilkes and his wife were separated but not divorced. However, the Court's discussion deviated from the language of the Act, and seems to have reverted to the common law rule, by adding the phrase "and facts which have come to their knowledge through the marital relationship". The analysis was further confused by intermixing the rule prohibiting testimony against a spouse, and the rule prohibiting testimony regarding to confidential communications. For these reasons, the value of *Wilkes* as precedential authority is suspect. Nevertheless it lends some support to the view that considered generically, without regard to distinctions between statute and common law, the prohibition was understood as applying to "confidential communications between [spouses] and facts which have come to their knowledge through the marital relationship." *Id.*

tions and conversations in which others have participated." 98 Pa. at 503.

A later case citing to both *Robb's Appeal* and *Stephens v. Cotterell* appears to give very limited scope to the "knowledge of facts gained through the marital relationship" as a class of information subject to the prohibition. In *Stewart v. F.A. North Co.*, 65 Pa.Super. 195 (1916), the court allowed the testimony of the former wife of the plaintiff, called as a witness by the defendant in a civil action, regarding facts which *could* have come to the knowledge of someone other than the witness. The court stated, "we are unable to see that the knowledge possessed by Mrs. Stewart as to the contents of the cellar of the house in which she lived was in any sense a confidential matter or that it was acquired in her relation to her husband as a wife.... It was knowledge of a physical fact, not communicated by the husband or having any relation to or association with their relation as husband and wife." Subsequent cases citing *F.A. North* for the common law rule made no reference at all to "knowledge acquired in the relation of husband and wife." See, e.g., *Commonwealth v. Beddick*, 180 Pa.Super. 221, 119 A.2d 590, 593 ("The disqualification that remains after the dissolution of the marriage is restricted to communications of a confidential nature."); and *Commonwealth v. Borris, supra* (same).

■ We have been unable to find any cases which may be considered as the common law origins of the reference in *Cornell v. Vanartsdalen* or elsewhere to "matters coming to one's knowledge through the marital relationship," and thus we cannot declare with certainty how broadly that phrase was ever actually applied. Nevertheless, we must conclude that, considered as a type of information distinct from "confidential communications" it can have no place in the current formulation of the common law privilege. Indeed, this must have been the case beginning with the passage of the Act of May 23, 1887, which, with respect to marriages continuing in existence, limited the prohibition to "confidential communica-

tions." [3]  It would be quite anomalous to hold that the prohibition is broader following dissolution of a marriage than it is where the marriage continues. Accordingly, we hold that the common law prohibition on testimony following termination of a marriage extends only to confidential communications made by one of the partners to the other.

The Appellant, however, suggests that acts may be considered communications, and thus subject to the prohibition against disclosure, where they are undertaken in reliance on the confidential nature of the marital relationship. The Appellant's argument begins with a standard dictionary definition of "communicate" as "to impart knowledge of; make known." According to the Appellant, his acts imparted knowledge and information to his wife, therefore they constituted communications. He further asserts that he acted in reliance on the confidence that the marital relationship inspired. This latter assertion is followed by reference to the public policy behind the privilege, i.e., "the preservation of marital harmony and the resultant benefits to society." Finally, the Appellant identifies decisions from a number of other jurisdictions holding that the marital communications privilege precluded testimony by one spouse regarding acts performed by the other in reliance on the confidentiality of the husband-wife relationship.[4] He argues that the reasoning offered by the courts in

3. For purposes of this analysis, it matters not whether the legislature intentionally avoided referring to "facts coming to one's knowledge through the marital relationship" or simply did not consider such to be a part of the common law being codified.

4. In the portion of his brief devoted to this argument, the Appellant cites *People v. Daghita*, 299 N.Y. 194, 86 N.E.2d 172 (1949), *Shepherd v. State*, 257 Ind. 229, 277 N.E.2d 165 (1971), *Arnold v. State*, 353 So.2d 524 (Ala.1977), and *State v. Holmes*, 101 N.C.App. 229, 398 S.E.2d 873 (1990), aff'd, 330 N.C. 826, 412 S.E.2d 660 (1992). Elsewhere, he cites *Whitehead v. Kirk*, 104 Miss. 776, 61 So. 737 (1913), and *State v. Smith*, 384 A.2d 687 (Me.1978). Also cited are *State v. Carpenter*, 83 Ohio App.3d 842, 615 N.E.2d 1103 (1992), *State v. Robinson*, 180 W.Va. 400, 376 S.E.2d 606 (1988), *People v. Burton*, 6 Ill.App.3d 879, 286 N.E.2d 792 (1972), *State v. Robbins*, 35 Wash.2d 389, 213 P.2d 310 (1950), and *Menefee v. Commonwealth*, 189 Va. 900, 55 S.E.2d 9 (1949), and several later cases from some of these same states which follow the already cited precedent.

support of these decisions is persuasive and should be applied in the interpretation of Pennsylvania law.

The Commonwealth's response to the definitional premise of the Appellant's argument is that communication connotes an *intention* to impart knowledge or convey information. One person observing the actions or conduct of another may be said to acquire information from what he observes, but it is only if the actor intends to convey a meaning or message that communication is involved. The Commonwealth cites to authorities advancing the view that actions come within the privilege only when the acting spouse intends to convey a meaning to the observing spouse,[5] and argues that several of the cases cited by the Appellant are in fact consistent with this analysis. Assuming arguendo that the Appellant's actions can be considered communications, the Commonwealth proposes that they cannot be considered confidential because they were undertaken in a public place where anyone could have observed them.

Upon close examination of the many cases from other jurisdictions, we note two considerations that must be given due attention. First, as observed by the Virginia Supreme Court in *Menefee v. Commonwealth,* 189 Va. 900, 55 S.E.2d 9 (1949), and also by the West Virginia Supreme Court in *State v. Robinson,* 180 W.Va. 400, 376 S.E.2d 606 (1988), many decisions depend on the particular wording of the statutes of the respective states. Consequently, although they may be of some interest, they do not provide direct authority for discerning the contours of a common law rule. Second, as also observed in *Menefee,* "[n]umerous conflicting decisions of other states and the divergent views of eminent textwriters evidence the fact that there exists a marked division of authority upon the subject." 55 S.E.2d at 13. Even where the statement of the rule and purpose behind it are essentially the same, courts have reached different conclusions regarding

5. The Commonwealth cites and discusses *United States v. Estes,* 793 F.2d 465 (2d Cir.1986), and McCormick on Evidence (4th ed.1992), Vol. 1, p. 296.

the question of whether actions are protected from disclosure as "communications".

We agree with the Commonwealth that although communication need not involve words, it must involve more than observation by one person of the conduct of another; it must involve the attribution of a message or meaning to that conduct.[6] Whether particular sounds, gestures, or actions constitute "communications" depends in large measure on the context in which they occur. Thus it falls to the trial court to evaluate the offer of proof to determine whether the witness's testimony would simply describe activity of the spouse that occurred in his or her presence or would disclose the conveyance of a message.[7]

Nor are we persuaded that the policy underlying the privilege requires that observations of conduct as well as verbal statements be protected from disclosure. Were we to accept this argument, the term "communication" would bring into the privilege the concept of "facts coming to one's knowledge through the marital relationship." As we have indicated above, since 1887 the statutory law of the Commonwealth has not regarded it as necessary, in protecting the integrity of intact marriages, to prohibit a person from testifying about such facts, and we consider it inappropriate to employ a different precept under the common law where the marriage no longer exists.

Based on the foregoing analysis, we conclude that the common pleas court did not err in permitting Denise Chiappi-

6. Cf. Pa. Rule of Evidence 801(a)(2) ("A 'statement' is ... nonverbal conduct of a person, if it is intended by the person as an assertion.")

7. In this regard it must be recognized that the preliminary question of whether a communication is involved is separate from the issues of confidentiality and whether the claim of privilege is valid. Thus the presumption of confidentiality does not attach until it has first been established by the person claiming benefit of the privilege that the conduct should be construed as a communication. See *State v. Smith*, 384 A.2d 687, 691 n. 4 (Me.1978) (applying Maine statute extending privilege to "marital communications" and case law interpretation of statute as limited to "confidential communications").

ni to testify about the Appellant's actions in leaving their car at a certain location and returning some time later.

■ The second question we accepted for review is whether the Appellant should have received credit towards his sentence for time served in a home confinement/electronic monitoring program. The specific program that the Appellant was subject to was run by the Lackawanna County Prison authorities. Generally, the rules and regulations of the program specified that a participant in the program was considered an inmate of the Lackawanna County Prison and that his/her residence would be considered a jail without bars. Participation in the program was monitored by a non-removable ankle or wrist bracelet which the participant was required to wear at all times. A monitoring device was connected to a participant's telephone and corrections personnel was permitted to enter the participant's home in order to maintain this equipment. Additionally, the restrictions imposed by the program were monitored by telephone calls and visits by home detention staff members. A participant was required to cooperate with home detention staff and permit them to enter the residence upon request at any time of day or night.

The Appellant was initially tried on the charges against him and found guilty in March of 1993. During the pendency of his Motion for Arrest of Judgment and/or New Trial, he was subject to the Lackawanna County Home Confinement/Electronic Monitoring program. It appears that he was subject to the same restrictions after the common pleas court granted his motion and ordered a new trial, after the second trial resulted in guilty verdicts on January 18, 1995, and following the denial of post-verdict motions and imposition of sentence.[8]

8. We note that on March 30, 1995, the trial court granted Appellant's motion for bail pending post-sentence motions and/or appeal. At that time, the court increased Appellant's bail by $50,000 and upon motion by the Commonwealth, the court removed a condition of Appellant's bail that had been ordered previously on January 18, 1995, that the Appellant remain on the "electronic monitoring device—home confinement program of the Lackawanna County Probation [O]ffice." Interestingly, the Commonwealth made this request believing that Appellant would receive credit for this time against his sentence. The Commonwealth stated in its motion that it sought to prevent Appellant from

Although at the time of sentencing the court allowed credit for the 518 days the Appellant had spent in the program to date, upon the Commonwealth's motion that credit was later rescinded based on *Shartle*. Even so, the court refused the Commonwealth's request to revoke bail pending appeal, and the Appellant has remained subject to the program since that time.

The parties agree that the issue before this Court is one of first impression and is whether a defendant is entitled to credit for time served in a home confinement/electronic monitoring program against his sentence for purposes of Section 9760 of the Sentencing Code, 42 Pa.C.S. § 9760.

Section 9760 states in relevant part:

After reviewing the information submitted under § 9737 (relating to report of outstanding charges in sentences) the Court shall give credit as follows:

> (1) Credit against the maximum term and any minimum term shall be given to the defendant for all time spent in custody as a result of the criminal charge for which a prison sentence is imposed or as a result of the conduct on which such charge is based. Credit shall include credit for time spent in custody prior to trial, during trial, pending sentence, and pending resolution of an appeal.

As the parties agree, the issue is whether the time Appellant spent subject to the home confinement/electronic monitoring program constitutes "time spent in custody". The Sentencing Code does not set forth a definition of custody for purposes of Section 9760. Pursuant to the Statutory Con-

---

receiving credit against his sentence for time spent on the "home confinement program." Appellee's Motion for Reconsideration of Conditions of Bail at 1.

Subsequently, the Commonwealth filed a motion for reconsideration of bail and requested that the court re-impose home confinement/electronic monitoring as a condition of bail following the Superior Court's decision in *Commonwealth v. Shartle*, 438 Pa.Super. 403, 652 A.2d 874 (1995), *petition for allowance of appeal denied*, 663 A.2d 690 (Pa.1995). wherein the court held that a defendant is not entitled to credit for time spent in the home confinement/electronic monitoring program. The court granted the Commonwealth's motion and, once again, Appellant was subject to the program.

struction Act, where a term is not defined by the Legislature, it shall be construed according to its common and approved usage. 1 Pa.C.S. § 1903(a). In the absence of any cases by this Court interpreting the word custody, the parties have referred us to cases discussing custody and imprisonment in the context of various legal proceedings.

Appellant cites to several cases from this Court and the United States Supreme Court characterizing the conditions and restrictions of bail and/or parole as sufficient to meet the definition of "custody". The cases involved whether the courts had jurisdiction to entertain a petition for writ of habeas corpus. Specifically, in *Jones v. Cunningham*, 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963), the habeas corpus statute allowed the district courts to grant habeas corpus "to a prisoner . . . in custody in violation of the Constitution . . . of the United States." The Supreme Court held that for these purposes, "in custody" did not mean that a person must be confined to jail; rather, it was sufficient that they still be under the jurisdiction of the court and subject to a restraint of liberty. Similarly, in *Commonwealth ex rel. Paulinski v. Isaac*, 483 Pa. 467, 397 A.2d 760 (Pa.1979), this Court held that to satisfy the custody requirement for a habeas corpus petition, it was sufficient that a person demonstrate that they [sic] were subject to restraints on their [sic] liberty "not shared by the public generally." *Id.* at 763.

The Commonwealth, on the other hand, cites to the Superior Court's opinion in *Shartle* and argues that this Court should adopt the Superior Court's reasoning. In *Shartle*, the Superior Court interpreted this Court's decisions in *Commonwealth v. Kriston*, 527 Pa. 90, 588 A.2d 898 (1991) and *Commonwealth v. Conahan*, 527 Pa. 199, 589 A.2d 1107 (1991), as prohibiting credit for time served in an electronic monitoring program.

In *Kriston*, a person convicted of violating 75 Pa.C.S. § 3731 (driving under the influence) for a second time was sentenced to thirty days, the mandatory minimum sentence under 75 Pa.C.S. § 3731(e)(1)(ii), to twenty-three months imprisonment. He began serving his sentence on June 15, 1987. Ten days

later, the warden of the prison, without the knowledge or consent of the sentencing court, transferred him to an electronic monitoring program, which required him to remain confined in his home [9] and subjected him to the possibility of unannounced visits and random drug and alcohol testing. When he applied for parole at the end of July, the court denied his petition and directed that he serve the remaining twenty days of the thirty day mandatory minimum sentence. Superior Court affirmed, holding that time spent in the home monitoring program did not satisfy the statutorily mandated minimum term of imprisonment specified in Section 3731.

On appeal, we reversed the Superior Court's decision based upon our conclusion that it would be manifestly unjust to deny appellant Kriston credit for that portion of his sentence which he served in the electronic home monitoring program after his transfer into the program by the prison warden.[10] Although we reversed on this ground, we also discussed the Superior Court's determination that a defendant convicted of driving under the influence could not serve the mandated term of "imprisonment" specified in Section 3731 in an electronic/home monitoring program. In approving this portion of the Superior Court's analysis, we noted that the term "imprisonment" used by the Legislature in Section 3731 was not specifically defined. Thus, applying statutory construction principles, we sought to determine the common and ordinary meaning of imprisonment. We concluded that imprisonment only encompassed confinement in a correctional or similar rehabilitative institution, and that alternative sentencing programs were not included within the common and ordinary meaning of the term.

One month after *Kriston*, we decided *Conahan*. In that case, we were also asked to decide whether the defendant could satisfy the mandatory term of imprisonment specified in

9. The electronic device would signal if the defendant moved more than 100 feet of his telephone.

10. Appellant likewise argues manifest injustice; however, in light of our determination that custody for purposes of Section 9760 encompasses the home confinement/electronic monitoring program employed here, we need not address this alternative argument.

Section 3731 for driving under the influence by applying the time he voluntarily spent in an inpatient alcohol rehabilitation facility towards the sentence.[11] Following a motor vehicle accident, Appellant Conahan was arrested for driving under the influence. Prior to pleading guilty for the charge, he voluntarily commenced inpatient treatment for alcoholism, which lasted ninety-five days. After completing the program, he was sentenced as a second time offender to a term of imprisonment of thirty days to one year. The trial court credited Conahan with the ninety-five days he spent in rehabilitation and granted immediate parole.

On appeal, the Superior Court reversed and determined that the word imprisonment used in Section 3731 did not encompass inpatient treatment programs. We disagreed and again we looked to the common and ordinary meaning of the term imprisonment set forth in Section 3731. Referring to our analysis in *Kriston,* we held that:

> successful completion of this custodial inpatient rehabilitation, which took place in three hospitals, falls within the common meaning of "imprisonment" and is a sufficient "institutional setting" as contemplated by this Court in *Kriston.*

We rejected the Commonwealth's assertion that the Legislature intended imprisonment as used in 3731 to mean jail and not other forms of custody. We stated:

> We recognize that the term "imprisonment" immediately conjures the image of being involuntarily confined behind bars. However, the dictionary definition and common usage is more encompassing. "Imprisonment" is defined as:

> The act of putting or confining a man in prison. The restraint of a man's personal liberty; coercion exercised upon a person to prevent the free exercise of his powers of locomotion. It is not a necessary part of the definition that the confinement should be in a place usually appropriated to the purpose; it may be in a locality used only for the

11. Although we referred to Section 9760 in our discussion in *Conahan,* we did not specifically address the issue of what constitutes custody for purposes of that section.

specific occasion; or it may take place without the actual application of any physical agencies of restraint (such as locks or bars), as by verbal compulsion and the display of available force. Every confinement of the person is an "imprisonment," whether it be in a prison, or in a private house, or even by forcibly detaining one in the public streets. Any unlawful exercise or show of force by which person is compelled to remain where he does not wish to be. Black's Law Dictionary (5th ed.1979).

*Conahan,* 589 A.2d at 1109.

The Superior Court in *Shartle* was asked to determine whether the trial court erred by not giving the defendant credit for pre-trial time served in a home electronic monitoring program. In that case, the defendant sought credit for twenty-two days she spent under house arrest subject to electronic monitoring as a condition of being released on her own recognizance between her arraignment and her preliminary hearing. Citing *Kriston* and *Conahan,* the Superior Court concluded that time spent in custody for purposes of 42 Pa.C.S. § 9760(1) must be "the equivalent of time served in an institutional setting," *id.* at 877, and thus held that credit for the twenty-two days was properly denied.

With this background, we note that none of the cases cited by the parties is dispositive of the issue raised here. Although the Commonwealth asks us to adopt the reasoning employed by the Superior Court in *Shartle,* which is factually similar to this case, we decline to do so based upon our determination that the court incorrectly concluded that our decisions in *Kriston* and *Conahan* were controlling.

At the outset, we note that *Kriston* and *Conahan* solely involved the interpretation of the term "imprisonment" for purposes of the offense of driving under the influence of Section 3731 of the Motor Vehicle Code. Here, we are concerned with the meaning of the term "custody" used in Section 9760 of the Sentencing Code. The Commonwealth posits that the term custody is identical to the term imprisonment and that a defendant could only receive credit pursuant

to Section 9760 for time spent in prison or a similar institution. On the other hand, Appellant asserts that "custody," while encompassing "imprisonment," is not so limited as the Commonwealth suggests. We agree with Appellant.

The terms imprisonment and custody, although synonymous, are not identical. As Appellant advocates, the term custody is broader than the term imprisonment. Imprisonment is but one form of custody. In drafting Section 9760 of the Sentencing Code, the Legislature chose to use the term custody rather than the more restrictive term imprisonment. Given that we do not find these terms to be identical, we cannot disregard the different terminology used in Section 9760 and Section 3731 as the Superior Court did in *Shartle*. As a matter of policy, the legislature has chosen to give credit "against the maximum term and any minimum term ....for which a prison sentence is imposed ....for time spent *in custody* prior to trial, during trial, pending sentence and pending resolution of an appeal." (Emphasis added). It is not the prerogative of this Court to disregard or change the language employed by the legislature in enacting a statutory provision. Accordingly, we reject the limited interpretation of the term custody advocated by the Commonwealth, which would exclude forms of legal restraint other than imprisonment.

In determining whether a person has spent time in custody it is necessary to examine the extent of control exercised by those in authority. The type of technology employed in this case has made it possible for prison authorities to restrain and severely limit a person's freedom by limiting his ability to move about freely to the confines of his home. The restrictions placed upon Appellant here went well beyond the restrictions typically employed by a court in releasing a defendant on his own recognizance or upon a condition that a defendant not leave the jurisdiction of the court.[12]

12. We note that our discussion is limited to the specific program employed in this case. Whether other programs fall within the mean-

Based on the foregoing, we conclude that the 518 days that Appellant was subjected to this home confinement/electronic monitoring program provided sufficient restraints on his liberty to constitute time spent in custody for purposes of Section 9760 of the Sentencing Code.[13]

ing of the term custody is a question that will need to be examined in each individual case.

The dissent, on the other hand, would hold that one is precluded from receiving credit for time spent in an electronic monitoring program in all cases simply because the restrictions of the program are placed upon a defendant pursuant to a bail arrangement. The dissent states, "[t]o equate such restrictions of release with 'custody' for purposes of computing a **sentence** of incarceration ignores the very nature of bail. Because appellant was released on bail, and therefore was not in custody, I would hold that he is ineligible for credit for time spent in the home confinement/electronic monitoring program." Dissenting Opinion at 504.

The dissent's analysis misses the point. If a person is actually restrained while on bail, as in this case pursuant to the home confinement/electronic monitoring program, he or she is not "released" as a matter of law simply because the constraint is made pursuant to a bail arrangement. As noted above, the legislature contemplated that credit should be given for time spent *in custody* prior to trial. The legislature did not limit credit to instances of imprisonment and/or incarceration. Thus, as one can remain in custody, as in this case, pursuant to a bail arrangement, a case by case analysis of what constitutes custody for purposes of Section 9760 is necessary.

**13.** The dissent addresses an issue that was never raised or argued by the Commonwealth, namely, whether the County Intermediate Punishment Act, 61 P.S. 1101–1114, which specifies the types of alternative sentencing options available to sentencing courts, is dispositive of what constitutes custody for purposes of Section 9760 of the Sentencing Act. Specifically, the dissent notes that Appellant "never had a right to, nor even a legitimate expectation of, a sentence consisting in whole or in part of home confinement/electronic monitoring for arson." Dissenting Opinion at 506. The dissent arrives at this conclusion by noting that Appellant was ineligible as a matter of law to receive a sentence of home confinement/electronic monitoring for his arson convictions as he was not eligible for a sentence of intermediate punishment, i.e., home confinement. Thus, the dissent would hold that because Appellant was not entitled to receive an ultimate sentence of home confinement pursuant to the Sentencing Code and the County Intermediate Punishment Act, he is precluded from receiving credit for time spent in such program as such program cannot be equated with custody for purposes of Section 9760.

As noted, this issue was never raised or argued by the Commonwealth, but is raised for the first time by the dissent. Moreover, relying on an issue that was never argued or briefed by the parties raises more questions than answers. For instance, were we to consider this issue

Accordingly, the judgment of sentence is affirmed in part and the matter is remanded to the common pleas court for computation of credit for 518 days under Section 9760 in accordance with this decision.

Jurisdiction is relinquished.

Justice NIGRO files a concurring opinion.

Justice CAPPY files a concurring and dissenting opinion.

Justice CASTILLE files a concurring and dissenting opinion.

Justice SAYLOR files a concurring and dissenting opinion.

Justice NIGRO Concurring.

I agree with the majority that the trial court did not err in allowing Denise Chiappini to testify about her observations of Appellant's actions. I write separately, however, because I cannot agree with the majority's conclusion that house arrest constitutes "custody" for purposes of 42 Pa.C.S. § 9760(1), as I generally frown upon a process that allows people to serve

and conclude as the dissent does that the County Intermediate Punishment Act controls how we interpret custody for purposes of Section 9760, it is likely that our analysis in *Conahan* would have to be overruled. In that case appellant Conahan "never had a right to, nor even a legitimate expectation of, a sentence consisting in whole or in part" of inpatient treatment. As Justice Cappy notes in footnote 1 of the opinion, the Legislature had only recently amended the County Intermediate Punishment Act so as to permit sentencing courts the option of imposing intermediate punishment of this nature. *Conahan*, 589 A.2d at 1110 n. 1. Thus, pursuant to the dissent's analysis, since Conahan could never have received an ultimate sentence of rehabilitation, he should not have been allowed to receive credit pursuant to Section 9760 for the time he spent in a rehabilitation facility.

Also problematic is the fact that according to the dissent, as discussed in footnote 12, one could never receive credit for time spent in a home confinement/electronic monitoring program as a condition of bail. However, this appears to be internally inconsistent with the dissent's analysis regarding application of the Intermediate Punishment Act in that the dissent's analysis seems to contemplate that in some instances, where intermediate punishment may be imposed as one's ultimate sentence, credit for purposes of custody pursuant to Section 9760 may be warranted.

Again, these points illustrate the wisdom of courts refraining from considering issues that were not argued and/or briefed by the parties.

sentences in the comforts of their own home. Instead, in my view, the Superior Court properly concluded in *Commonwealth v. Shartle* that time spent in "custody" must be the "equivalent of time served in an institutional setting." 438 Pa.Super. 403, 652 A.2d 874, 877 (1995).

Given the particular circumstances in the instant case, however, I agree with the majority that Appellant should be credited for his time spent in the electronic monitoring program. Here, Appellant was put on the monitoring program as a condition of bail following a guilty verdict in his first trial. He remained in the program while the trial court considered his motion for a new trial, after the trial court granted that motion and while he awaited his new trial. After his second trial resulted in a guilty verdict, Appellant continued to be subject to electronic monitoring until his sentence was imposed. At that point, Appellant had been in the electronic monitoring program for a total of 518 days. In light of these circumstances, I believe that Appellant should, on the basis of equity, receive credit for the 518 days he spent in the electronic monitoring program.

Justice CAPPY Concurring and Dissenting.

I concur in the result reached by the majority insofar as it affirms the decision of the trial court, which permitted Denise Chiappini to testify about her husband's actions on the night of the arson. However, as I agree with Mr. Justice Saylor that the question presented is one of statutory interpretation, I would adopt the analysis he puts forth in the concurring portion of his concurring and dissenting opinion.

I disagree with the majority on the second question presented. Where a defendant is permitted pretrial bail with home monitoring as a condition thereof, I do not believe that the defendant is then entitled to credit on his sentence for time spent at home.[1] *Commonwealth v. Kriston,* 527 Pa. 90, 588

1. Although I do admit that Mr. Justice Nigro's position is attractive given this defendant spent 518 days in a home monitoring program, ultimately I cannot agree that the facts of this case warrant that remedy.

A.2d 898 (1991); *accord Commonwealth v. Conahan,* 527 Pa. 199, 589 A.2d 1107 (1991).

Justice CASTILLE Concurring and Dissenting.

I join the majority opinion with respect to the holding that appellant's ex-wife's testimony was not privileged because her testimony described appellant's actions and therefore did not constitute a privileged communication. I respectfully dissent, however, from the majority's determination that appellant is entitled to "credit for time served," 42 Pa.C.S. § 9760, against his state prison sentence for the first-degree felony of arson endangering persons, 18 Pa.C.S. 3301(a)(1), for the period during which he was released on bail subject to a home confinement/electronic monitoring program supervised by Lackawanna County prison authorities.

At the heart of the majority's holding on credit for time served is its conclusion that, as a matter of common and approved usage, "the term custody is broader than the term imprisonment" and thus "[i]mprisonment is but one form of custody." Op. at 498, 501. However true this semantical difference may be as an abstract matter, the reality here is that appellant was subject to the home confinement/electronic monitoring program as a condition of his release on **bail.** Bail is neither a form of, nor in any way synonymous with, custody or imprisonment; rather, it is a form of **release** from custody.

Bail is an issue only after the Commonwealth has acquired a right, following judicial approval to proceed with a criminal matter, to restrict an individual's freedom pending trial (and later, pending sentencing and/or appeal). The version of Rule 4003 of the Rules of Criminal Procedure in effect in 1993, the time relevant here, is entitled "Release of Defendant on Defendant's Own Recognizance or on Nominal Bail." The rule thus speaks in terms of release. By no stretch of the imagination can release be consonant with either custody or imprisonment. Then–Rule 4013 also referred to bail as a form of release and, furthermore, recognized that release on bail could be subject to various conditions, as it stated that a person admitted to bail was obliged to, *inter alia,* "[c]omply with any

specific requirement of release which may be reasonably imposed by the issuing authority or court. . . ." The 1996 amendments to the bail rules corroborate this understanding of the nature of bail. Indeed, this Court specifically recognized in those rules that home confinement is an appropriate nonmonetary condition of release on bail under Rule 4006. Notably, the Comment to Rule 4006 contains a listing of examples of appropriate conditions of release on bail, including "restricting the defendant to his or her residence or a supervised halfway house. . . ."

It is difficult to see how a defendant whom the rules permit to be **released** on bail can be said to be deemed "in custody" for purposes of any later imposition of sentence and awarding of credit for "time served" against a prison term. The fact that home confinement or electronic monitoring is required as a **condition** of bail does not alter the fundamental meaning of bail release. It is, of course, true that the condition acts as a restriction upon the defendant's freedom; but so, too, do myriad other potential conditions of bail, such as a bond, a reporting requirement, surrendering one's passport, a stay-away order, drug testing, etc. Such conditions are routinely welcomed, and even requested, as a desirable tradeoff to avoid placement in an institutionalized setting. To equate such restrictions of release with "custody" for purposes of computing a **sentence** of incarceration ignores the very nature of bail. Because appellant was released on bail, and therefore was not in custody, I would hold that he is ineligible for credit for time spent in the home confinement/electronic monitoring program. The majority disputes this analysis (*see* Op. at 501 n. 12) simply by ignoring the fact that restrictions of one sort or another, whether monetary or non-monetary, are nearly always imposed on individuals who are released on bail. The fact that the particular restriction involved in this case confines the individual to his home does not alter the fundamental fact that the individual is **released** on bail and, therefore, not **in custody.**

Like Justice Nigro, I find further support for this conclusion in the Superior Court's decision in *Commonwealth v. Shartle,*

438 Pa.Super. 403, 652 A.2d 874 (1995). There, the Superior Court found that a defendant was not entitled to credit against her sentence for time spent in a home confinement program from the time of her arrest until her preliminary hearing. The court pointed to the non-custodial nature of a sentence served in one's home and concluded that it is "not the equivalent of time served in an institutional setting." *Id.* at 409, 652 A.2d at 877.

Finding the term "custody" in 42 Pa.C.S. § 9760 to be synonymous with the term "imprisonment" in 75 Pa.C.S. § 3731, the Superior Court applied this Court's holdings in *Commonwealth v. Kriston*, 527 Pa. 90, 588 A.2d 898 (1991) (holding that sentences of imprisonment pursuant to 75 Pa. C.S. § 3731 must be served in institutional settings) and *Commonwealth v. Conahan*, 527 Pa. 199, 589 A.2d 1107 (1991) (credit for time served in an inpatient alcohol rehabilitation program is time served in an institutional setting and therefore imprisonment pursuant to 75 Pa.C.S. § 3731). In *Conahan,* this Court had expressed its concerns with awarding sentencing credit for time spent in a home confinement program:

> In *Kriston* we were concerned with the non-custodial nature of a sentence being served in a personal residence. While it is true that one subject to home monitoring has his liberty restrained and risks being sent to prison if he violates the terms of the program, we could not hold that such a sentence was sufficient to satisfy the goals of the Legislature given the abundant amenities and nonrehabilitative temptations present in the home.

*Id.* at 203, 589 A.2d at 1109.

Our reasoning in *Kriston* and *Conahan* should apply with equal force here. Release on any form of bail necessarily restricts one's liberty. But release to a home confinement program does not even begin to approach the sort of restrictions that necessarily attend an institutionalized setting. A defendant in a home confinement program is free to move about in his home, eat, watch television, sleep in his own bed, socialize with family and friends and otherwise enjoy the

comforts of his home at will. Being told the judicial equivalent of "go to your room" in no way approaches being ordered to pack a few belongings, leave that home, and report to a prison cell. In light of the fundamental and obvious distinction between time spent in an institutional setting and time spent dallying at home subject only to sporadic monitoring, I would find that appellant is not entitled to credit against his prison sentence for time he spent at home on bail subject to electronic monitoring.

Furthermore, I find it particularly inappropriate to award sentencing credit for time spent at home subject to a county monitoring program where, as here, the sentence ultimately imposed by the court for this first degree felony called for total confinement to a state correctional institution. Under the Sentencing Code, trial courts generally have a variety of discretionary sentencing options, including guilt without further penalty, probation (with various possible restrictions), intermediate punishment, partial confinement, and total confinement. 42 Pa.C.S. § 9721(a). Bail release to home confinement obviously has something in common with less restrictive sentencing alternatives such as intermediate punishment—albeit there is no rehabilitative or punishment component present in bail release where the concerns have to do with ensuring the defendant's appearance and the safety of the public—but it has nothing in common with a sentence of total confinement. The trial court here determined that appellant's conviction of arson endangering persons, a felony of the first degree punishable by up to twenty years' imprisonment, 18 Pa.C.S. § 1103(1), required a sentence of total confinement in state prison for a minimum period of five years. Requiring the court to reduce appellant's punishment by crediting against it time he spent at home on bail release subject to monitoring depreciates the seriousness of his crime and amounts to an undeserved and unjust windfall.

Even aside from this fundamental difference between "bail release" to one's home and "custody" for sentencing credit purposes, the Sentencing Code, 42 Pa.C.S. § 9701 *et seq.,* and related provisions of the County Intermediate Punishment

Act, 61 P.S. 1101–1114, make clear that it is inappropriate to award credit for "time served" against a sentence of total confinement where the "time" at issue was "served" at home on bail release in a county-run electronic monitoring program and the crime involved is arson.[1] Under the Sentencing Code, a sentence of non-incarceration, but involving conditions such as a requirement "[t]o remain within the premises of the defendant's residence during the hours designated by the court," 42 Pa.C.S. § 9763(b)(16), and/or "[t]o be subject to electronic monitoring," *id.* § 9763(b)(17), is a sentence of intermediate punishment. *Id.* But, the Code specifically provides that persons convicted of certain enumerated crimes, including arson, "shall be ineligible" for sentences of intermediate punishment. *Id.* § 9729(c)(1).[2] Accordingly, it is indisputable that appellant was **ineligible** as a matter of law to receive a **sentence** of home confinement/ electronic monitoring, at least with respect to his arson convictions. *See also Commonwealth v. DiMauro*, 434 Pa.Super. 129, 642 A.2d 507, 508 (1994) (although § 9763 does not specifically define intermediate punishment, it does provide that electronic monitoring is permissible condition under intermediate punishment; therefore, home monitoring sentence imposed on defendant convicted of aggravated assault, an offense ineligible for intermediate punishment programs, was illegal). In short, appellant never had a right to, nor even a legitimate expectation of, a sentence consisting in whole or in part of home confinement/electronic monitoring for arson. Requiring the court to reduce the **sentence** it imposed by crediting time spent on bail

1. Effective on August 21, 2000, the General Assembly repealed the version of the County Intermediate Punishment Act governing this appeal and replaced it with a revised County Intermediate Punishment Act, which is now codified as part of the Judicial Code, *i.e.*, at 42 Pa.C.S. § 9801 *et seq. See* Act 2000–68, June 22, 2000, P.L. 345, No. 41, § 6 (establishing new Act), § 7 (repealing old Act), effective in 60 days. The new County Intermediate Punishment Act, like the old, makes clear that persons convicted of arson are ineligible for sentences of intermediate punishment.

2. Act 68–2000 also repealed § 9729. The subject matter of § 9729 is now subsumed within the revised County Intermediate Punishment Act codified in the Judicial Code. *See* Act 2000–68, June 22, 2000, P.L. 345, No. 41, § 2, effective in 60 days.

in a restricted release program that the General Assembly explicitly directed was **unavailable** as a sentencing option for arsonists ignores the Sentencing Code as a whole and depreciates the seriousness of appellant's offense.

Finally, the majority's conclusion that time spent on bail subject to home confinement and monitoring must be deemed "custody" subject to sentencing credit is also squarely contradicted by the terms of the County Intermediate Punishment Act. The version of the Act applicable here made clear, as the Sentencing Code did, that convicted arsonists were ineligible for sentences of intermediate punishment. 61 P.S. § 1102. The Act went on to describe the options for county intermediate punishment programs as including: "**Noncustodial** programs which involve close supervision, but not housing, of the offender in a facility, including, but not limited to: .... (iv) house arrest and electronic monitoring." *Id.* § 1104(a)(1)(iv) (emphasis supplied).

The language in the Act is significant for two reasons. First, like the Sentencing Code, the Act makes clear that home confinement/electronic monitoring programs are a form of intermediate punishment and, as such, are unavailable sentences for more serious offenders, including convicted arsonists. Second, it speaks directly to the General Assembly's view of whether home confinement/electronic monitoring programs may be deemed custodial. The Act makes clear that, in the judgment of the General Assembly, such a program is, by definition, **noncustodial.** While the majority is correct that the Sentencing Code does not define the term custody as used in 42 Pa.C.S. § 9760, op. at 498, the Act, which is **specifically** devoted to the form of restraint precisely at issue here, reveals an unequivocal legislative judgment that such programs are non-custodial. The General Assembly obviously shares this Court's former view, expressed both in *Kriston* and *Conahan,* that home confinement programs are, by nature as well as by definition, "non-custodial." I would not ignore this actual legislative pronouncement in favor of the abstract semantical differences in the terms "imprisonment" and "custody" that the majority deems to be controlling here.

The majority questions the propriety of looking to the County Intermediate Punishment Act for guidance in determining whether appellant is entitled to credit for time served because the Commonwealth has not raised or argued the applicability of that Act. Op. at 501 n. 13. But in the realm of statutory interpretation this Court is not constrained by the parties' arguments; rather, it is this Court's function to determine the meaning of the legislation, a determination that often requires examination of similar or related statutory pronouncements. This Court has recently reaffirmed our authority, if not our duty, to independently interpret a statute whose meaning is at issue, when necessary to effectuate the intention of the General Assembly, irrespective of the positions of the parties. In *Commonwealth v. Collins*, 764 A.2d 1056 (Pa. 2001), the question was whether the offenses of homicide by vehicle and homicide by vehicle while driving under the influence of alcohol merge for sentencing purposes. The Commonwealth there **conceded** the defendant's argument, agreeing that the two offenses merged. *Id.* at 1058 n. 4. Notwithstanding the absence of an argument from either party that the statutes should be deemed not to merge, this Court, with Justice Zappala authoring the majority opinion, held that the offenses did not merge because "the legislature crafted the statutory elements of the two offenses as mutually exclusive...." *Id.* at 1059.

Similarly, the General Assembly has made clear in the County Intermediate Punishment Act that home confinement/electronic monitoring programs do not constitute "custody." That legislative reality is relevant to the "custody" question presented here—specifically, the question whether time spent on bail on home confinement amounts to "custody" for purposes of sentencing credit. It is logical and proper to look to other legislation dealing with intermediate punishment to determine if our legislature intended that intermediate punishment be deemed the equivalent of custody. This Court should not turn a deliberately blind eye to such relevant legislative pronouncements. By holding that, in this case, home confinement as a condition of bail is the equivalent of

custody, the majority ignores what I believe to be a clear expression of legislative intent. Hence, I dissent from the majority's holding on the question of credit for time served.[3]

Justice SAYLOR Concurring and Dissenting.

Concerning the spousal confidential communications privilege, I would reach the same result as the majority, but by employing a somewhat different analysis. As the majority notes, Section 5914 of the Judicial Code, 42 Pa.C.S. § 5914, must be strictly construed. *See* 1 Pa.C.S. §§ 1928(a), (b)(8), 1962. Pursuant to the rule of strict construction, it must be presumed that the statute was intended to effect no change in the common law beyond that which is expressly stated. *See In re Boles' Estate*, 316 Pa. 179, 182, 173 A. 664, 665 (1934). Thus, only such modification of the common law will be recognized as the statute clearly and definitely prescribes. *See Heaney v. Borough of Mauch Chunk*, 322 Pa. 487, 490, 185 A. 732, 733 (1936).

Section 5914, which states that "in a criminal proceeding neither husband nor wife shall be competent or permitted to testify to confidential communications made by one to the other," can be read as applying only where the parties to the communications are still husband and wife when the criminal proceeding takes place. It contains no express limitation to that effect, however, and such a restriction should not be implied so as to effect a change from the common law. Rather, the statute "should be so interpreted that it will accord, as nearly as may be, with the theretofore existing course of the common law," *Bridgeford v. Groh*, 306 Pa. 566, 575, 160 A. 451, 453 (1932)—in other words, so that, as to confidential communications made while the participants were husband and wife, it applies even after the marriage is terminated by death or divorce. Although certainly this interpretation conflicts with the analysis applied in *Dumbach v. Bishop*, 183 Pa. 602, 39 A. 38 (1898), I find that it more closely follows the rules of statutory construction. The alternative (that is,

**3.** The General Assembly, of course, is free to amend the subject legislation to prevent the windfall endorsed by the majority in future cases.

interpreting the principle of strict construction as the majority has done) results, in the post-marital context, in the statute being disregarded concerning the very subject which the legislature presumably intended it to control.

Thus, I would approach the issue before us as a straightforward question of statutory interpretation: Does the term "communications" as used in Section 5914 encompass conduct as well as verbal communications? Applying the principle that the words of a statute are to be construed according to their common and approved usage, *see* 1 Pa.C.S. § 1903(a), I would conclude that it does not. Accordingly, I agree with the majority that the trial court did not err in permitting Appellant's ex-wife to testify about Appellant's actions on the night of the fire.

Concerning the question of credit for time served, I must respectfully dissent from the analysis set forth by Mr. Justice Zappala. For the reasons articulated by Mr. Justice Castille in his Concurring and Dissenting Opinion, which I join, I do not believe the legislature intended that a defendant who has been sentenced to a period of total confinement in a state correctional institution should receive credit against such sentence for time spent in a home confinement/electronic monitoring program pursuant to the terms of a bail order prior to trial and/or pending appeal. As this Court observed in *Commonwealth v. Kriston*, 527 Pa. 90, 588 A.2d 898 (1991), "[n]umerous provisions of the Sentencing Code ... demonstrate a legislative intent that sentences of imprisonment are to be served in institutional settings." *Id.* at 94, 588 A.2d at 900. A similar understanding prevails in the federal system. *See Reno v. Koray*, 515 U.S. 50, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995) (concluding that a federal prisoner is not entitled to credit against his sentence for the period when he was released on bail).[1]

1. Like Mr. Justice Nigro, I would not foreclose the possibility that, in a particular case, circumstances may warrant the recognition of credit for time served to avoid a manifest injustice to the defendant. *See generally Kriston*, 527 Pa. at 97–98, 588 A.2d at 901 (awarding credit for the portion of the defendant's sentence served in an electronic home monitoring program to which the defendant had been transferred at the

unauthorized initiative of the prison warden). In my view, however, Appellant has failed to demonstrate that this is such a case. As the sole source of his mistaken belief that credit would be given for time spent on bail release, Appellant cites the Lackawanna County Home Detention Program Rules and Regulations, a copy of which is included in the reproduced but not the original record. Provision of this document to a defendant released on bail may have been erroneous; references to contact with the Probation and Parole Office and to payment of fines or restitution suggest that these rules and regulations were designed for inmates who are serving a form of intermediate punishment. Nevertheless, the document makes no reference to receiving credit for time served in the program, and I am not persuaded that this document, without more, would have warranted a justifiable expectation that such credit would be given or, more fundamentally, would establish a manifest injustice.